

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALEX CRUZ,

Plaintiff,

-against-

COX MEDIA GROUP, LLC,

Defendant.

**MEMORANDUM & ORDER**
**18-CV-1041 (NGG) (AKT)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Alex Cruz brings this action against Defendant Cox Media Group, LLC ("Cox") alleging infringement of Plaintiff's copyright in a photograph he took of the arrest of terror suspect Sayfullo Saipov. (Compl. (Dkt. 1).) Before the court are cross motions for partial summary judgment. Plaintiff seeks judgment on Cox's liability for infringement and dismissal of Cox's affirmative defenses. (*See* Pl.'s Mem. in Supp. of Mot. for Part. Summ. J. (Dkt. 29) ("Pl.'s Mem."); Pl.'s Mem. in Opp. to Def.'s Cross Mot. for Part. Summ. J. (Dkt. 40) ("Pl.'s Opp.").) Cox opposes Plaintiff's motion and seeks either a judgment of no infringement or, in the alternative, fair use. (*See* Def.'s Cross Mem. in Supp. of Mot. for Part. Summ. J. (Dkt. 34) ("Def. Mem."); Def's Reply in Supp. of Cross Mot. for Summ. J. (Dkt. 42) ("Def. Reply").) For the following reasons, Plaintiff's motion is GRANTED and Defendant's motion is DENIED.

## I.    BACKGROUND

The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence they submitted. Except where otherwise noted, the following facts are undisputed. All evidence is construed in the light most

favorable to the non-moving party with all "reasonable inferences" drawn in its favor. *ING Bank N.V. v. M/V Temara, IMO No. 9333929*, 892 F.3d 511, 518 (2d Cir. 2018).

Plaintiff is Alex Cruz, a New York City native who works at Jennifer Convertibles, a furniture company in downtown Brooklyn. (Oct. 18, 2018 Tr. of Cruz Dep. ("Cruz Dep.") (Dkt. 37-1) 9:17-25.) Cruz is not and has never been a professional photographer. (Def.'s R. 56.1 Stmt. ("Def. 56.1") (Dkt. 39) ¶ 37.) On October 31, 2017, Cruz was walking on Chambers Street in the Tribeca neighborhood of New York City, on the way to visit the apartment of his girlfriend, Trish McFarlane. (*Id.* ¶ 42.) Cruz noticed a "big commotion" near the intersection of Chambers and West Streets, and saw a man acting erratically as law enforcement officers approached him. (*Id.*) As Cruz saw the scene unfolding, he reached for his iPhone and took a photograph of a criminal suspect named Sayfullo Saipov, lying on the ground, being apprehended by New York City police after Saipov had committed a terrorist attack (the "Photograph"). (*See* Ex. A hereto.)

After taking the Photograph, Cruz continued on to McFarlane's apartment and sent the Photograph to a friend, Lenny Bautista. (Def. 56.1 ¶ 46.) Until Bautista informed him otherwise, Cruz believed he had taken a "simple picture" of somebody who appeared to be "acting crazy." (*Id.* ¶ 47.) Bautista posted the Photograph to his Instagram account @illmaticNYC and, initially, took credit for the Photograph. (Pl.'s R. 56.1 Stmt. ("Pl. 56.1") (Dkt. 33) ¶ 10.) However, McFarlane posted her own message on Instagram, clarifying that it was Cruz, and not Bautista, who had taken the Photograph. (*Id.*) Media organizations then began contacting McFarlane, asking her to seek permission from Cruz to republish the Photograph. Shortly thereafter, Cruz entered into two separate licensing agreements (with Cable News Network, Inc. ("CNN"), and NBC News ("NBC"), respectively), in

which Cruz granted the outlets permission to publish the Photograph in exchange for licensing fees and credit. (*Id.* ¶ 11.) The parties dispute the exact time Cruz entered into these agreements with CNN and NBC: Cruz states that he entered into the agreements "on or around October 31, 2017," (*See* Pl. 56.1 ¶¶ 12, 13), while Cox maintains that CNN and NBC did not send proposed licensing agreements to Cruz until November 1, 2017, and that the October 31, 2017 licensing agreements Cruz produced in discovery are not final executed documents. (*See* Def. 56.1 ¶¶ 12, 13.) Regardless, it is undisputed that media outlets expressed interest in publishing the Photograph and sought to enter into licensing agreements with Cruz to do so.

One media company that did not seek to enter into a licensing agreement with Cruz was Cox, a national media company with 13 television stations, 61 radio stations, four newspapers, and 72 websites. (Def. 56.1 ¶ 36.) Cox's media portfolio includes the WSB-TV television station in Atlanta, Georgia, as well as its associated wsbtv.com website. (*Id.*) On October 31, 2017, Cox published a news story on its WSB-TV website, eventually bearing the title "*8 dead in 'cowardly act of terror' in New York City*" (the "Article"). (*Id.* ¶ 55.) Later that same day, the Photograph was added to the gallery of video and photographic content for the Article. (*Id.*) The Photograph appeared, in full, as the second item in a gallery of video and photographic content positioned below both the headline and the date and time that the Article was last updated on the WSB-TV website, as well as on Cox's Twitter and Facebook pages. (Decl. of James Trigg ("Trigg Decl.") (Dkt. 37) ¶ 5; *see also* Oct. 31, 2017 WSB-TV Tweet ("WSB Tweet") (Dkt. 30-5) at ECF 2; Oct. 31, 2017 WSB-TV Facebook Post ("WSB Facebook Post") at ECF 2).) Cox did not credit Cruz as the author of the Photograph on the face of the Article or on the WSB Tweet and Facebook Post, nor did Cox seek Cruz's permission to publish the Photograph or license the Photograph directly from Cruz. (Pl. 56.1 ¶¶ 21-24.)

3

On November 1, 2017, Cruz, acting without counsel, filed a copyright application with the U.S. Copyright Office seeking to register the Photograph (as well as another photograph Cruz took of the same scene). (Nov. 1, 2017 Copyright Application (Dkt. 37-1) at ECF 91.) A few days later, on November 7, 2017, Cruz, now through counsel, filed a new registration of the Photograph with the Copyright Office (Pl. 56.1 ¶ 31; Cruz Dep. at 51:21-54:12.) The application was approved and Cruz currently possesses a registration certificate for the Photograph, numbered VA 2-074-488 and dated November 7, 2017. (Pl. 56.1 ¶ 32; *see also* Certificate of Registration (Dkt. 31-2) at 1.)

## II.    LEGAL STANDARD

A court must grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The movant may discharge its initial burden by demonstrating that the non-movant "has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (alteration adopted)).

"To determine whether an issue is genuine, '[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" *Mikhaylov v. Y & B Trans. Co.*, No. 15-CV-7109 (DLI), 2019 WL 1492907, at *3 (E.D.N.Y.

Mar. 31, 2019) (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995)). While the court must draw all inferences in favor of the non-movant, the non-movant "may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)).

The same standards apply to cross-motions for summary judgment. "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Bd. Of Educ.*, 667 F.2d 305, 324 (2d Cir. 1981)). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motions is under consideration." *Id.* at 121 (citations omitted).

## III.   DISCUSSION

### A.   Copyright Infringement

Cruz moves for summary judgment on the issue of copyright infringement, arguing that Cox infringed his copyright by unlawfully publishing the Photograph for its own use. (Pl.'s Mem. at 6; Pl's. Opp. at 1.) The court finds that the undisputed facts demonstrate Cox's liability for copyright infringement and grants Cruz's motion.

"To establish [copyright] infringement two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

1.     Ownership

"A certificate of copyright registration is prima facie evidence of ownership of a valid copyright, but the alleged infringer may rebut that presumption." *Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012) (citing *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004)). Here, Cruz has provided a copy of his Certificate of Registration for the Photograph. (*See* Certificate of Registration.) He has therefore established a prima facie case that he owns the copyright in the Photograph.

2.     Originality

Cox does not dispute either that Cruz has a valid Certificate of Registration or that Cox "actually copied" the Photograph.[1] Instead, Cox argues that Cruz has failed to establish that the Photograph was sufficiently original to qualify for copyright protection. (Def. Mem. at 6.)

Copyright protection only extends to *"original* works of authorship." 17 U.S.C. § 102 (emphasis added); *see Feist*, 499 U.S. at 345 ("[t]he *sine qua non* of copyright is originality."). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist*, 499 U.S. at 345 (citation omitted). "A photograph may be original in three respects: . . . rendition . . . timing . . . [and] creation of the subject." *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452-54 (S.D.N.Y. 2005); *see also Roger v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (explaining that the protectible, original elements of a photograph include "posing the subjects, lighting, angle, selection of film and camera, evoking the desired express, and almost any other variant involved.").

---

[1] See infra at 8.

As such, "almost any photograph may claim the necessary originality to support a copyright." *Mannion*, 377 F. Supp. 2d at 450 (citation and internal quotation marks omitted). However, a photograph may lack originality in rare cases, such as "where a photograph of a photograph or other printed matter is made that amounts to nothing more than slavish copying." *Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F. Supp. 2d 191, 196 (S.D.N.Y. 1999) (citation and internal quotation marks omitted).

Cox argues that Cruz "did not make a single creative choice" in taking the Photograph (Def. Mem. at 9), such that the Photograph does not possess the "modicum of creativity" required to receive copyright protection. (*See id.* at 8 (quoting *Feist*, 499 U.S. at 346 ).) This argument misses the mark. As with almost any photograph, the Photograph reflects creative choices, including Cruz's timing for when he took the Photograph. *See Mannion*, 377 F. Supp. 2d at 452 ("[A] person may create a worthwhile photograph by being at the right place at the right time.") (citation omitted). Indeed, Cruz's recognition of what he considered a "big commotion" (Def. 56.1 ¶ 42), and his decision to take the Photograph when he did (*i.e.* as law enforcement closed in on Saipov after he had been shot and was lying on the ground) were sufficient creative choices to meet the low threshold required for copyright protection. In addition, the Photograph is not an example of a "slavish copy" not entitled to copyright protection. *Cf. Bridgeman Art Library*, 36 F. Supp. 2d at 197 (finding no copyright in photographic transparencies that sought to reproduce precisely paintings in the public domain).

Cox points to *Oriental Art Printing v. Goldstar Printing Co.* (*see, e.g.*, Def. Mem. at 11-12) to support its argument, but that case is readily distinguishable. There, the court found that plaintiffs' photographs of commonly served Chinese food dishes lacked the "requisite originality" to receive copyright protection because they served "a purely utilitarian purpose" of giving customers a

"better understanding of what a particular dish contains" 175 F. Supp. 2d 542, 546-47 (S.D.N.Y. 2001). In addition, the court noted that the aim of the Copyright Act would not be furthered by finding the photographs in question eligible for copyright protection because such a holding would "effectively. . . permit [plaintiffs] to monopolize the market for printing menus that depict certain commonly served Chinese dishes." *Id.* at 548. Here, by contrast, Cruz's Photograph does not raise those same concerns. Unlike the photographs in *Oriental Art Printing* that only served to inform consumers of Chinese cuisine about their food options, the Photograph at issue here recorded a (manifestly) newsworthy event at a unique time and from a unique angle.

A holding extending *Oriental Art Printing* as Cox urges would improperly limit the scope of originality under the Copyright Act. A recent case in the Southern District of New York, *Sands v. CBS Interactive,* makes plain why. No. 18-CV-7345 (JSR), 2019 WL 1447014, at *1 (S.D.N.Y. Mar. 13, 2019). In that case, a paparazzo photographed actors on the set of an upcoming Netflix series *The Punisher*. *Id.* The photos were subsequently published alongside an article entitled "New Punisher Images Reveal Return of Key Daredevil Character." *Id.* While the *Sands* court had no trouble in finding that the photographs in question met the low creativity threshold necessary to assert copyright protection, *see id.* at *3, the result would have been different had it extended *Oriental Art Printing* as Cox urges this court to do now. This is because the *Sands* photos (under Cox's reading of *Oriental Art Printing*) would be deemed to only serve the purpose of informing the public of narrative developments in a popular television series, and therefore would lack originality. Yet, such a result would not comport either with the intent of the Copyright Act or the fact that "almost any photograph may claim the necessary originality to support a copyright." *Mannion*, 377 F. Supp. 2d at 450 (internal quotation marks omitted).

Finally, this case is distinguishable from *Oriental Art Printing* in another important way. In *Oriental Art Printing*, the court held that finding the photographs in question copyrightable would give plaintiffs an "unwarranted monopoly" because it "effectively would permit them to monopolize the market for printing menus that depict certain commonly served Chinese dishes." *Oriental Art Printing*, 175 F. Supp. 2d at 548 (citation omitted). "Such a result," the court explained "was not in Congress' intent in enacting the Copyright Act." *Id.* Here, by contrast, there is no such concern of an "unwarranted monopoly" because of the uniqueness of the Photograph and the one-time-only nature of its subject matter.

### 3. Actual Copying

Once a valid copyright registration is established, "a plaintiff must show that his work was actually copied and then must show that the copying amounts to an improper or unlawful appropriation." *Otto v. Hearst Comms., Inc.*, 345 F. Supp. 3d 412, 415 (S.D.N.Y. 2018) (citation omitted) (alterations adopted). Here, the parties do not dispute that Cox actually copied the Photograph for use on its website and social media accounts. As such, Cruz has established this element of his copyright infringement claim.

Accordingly, the court finds that Cox infringed on Cruz's copyright when it published the Photograph. The court therefore grants Cruz's motion for summary judgment on this issue.

### B. Affirmative Defenses

Both Cruz and Cox seek summary judgment on Cox's fair use defense. (*See, e.g.*, Pl.'s Mem. at 9; Def Mem. at 15.) Cruz further seeks summary judgment on Cox's remaining defenses. The court addresses each in turn.

### 1.    Fair Use

The purpose of copyright law is "[t]o promote the Progress of Science and useful Arts," U.S. Const., Art. I, § 8, cl. 8, and "expand public knowledge and understanding . . . by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015). There are limits, however, on creators' control over their own works, including the doctrine of fair use. *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014) ("Because copyright law recognizes the need for breathing space, however, a defendant who otherwise would have violated one or more of these exclusive rights may avoid liability if he can establish that he made fair use of the copyrighted material." (citation and internal quotation marks omitted)).

"[T]he fair use determination is an open-ended and context sensitive inquiry," in which the court weighs four non-exclusive statutorily provided factors in light of the purposes of copyright. *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (citation omitted). These factors are: (1) the purpose and character of the use, (2) the nature of the copyrighted work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market or value of copyrighted work. 17 U.S.C. § 107. The Second Circuit has held that the party seeking a judgment of fair use need not demonstrate that every factor weighs in its favor. *See Cariou*, 714 F.3d at 705. Rather, "all factors are to be explored, and the results weighed together, in light of the purposes of copyright." *Swatch*, 756 F.3d at 81 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 (1994) (alterations adopted)). Finally, the determination of "fair use is a mixed question of law and fact," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S.

539, 560 (1985), and the Second Circuit has repeatedly "resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact," *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (quoting *Castle Rock*, 150 F.3d at 137 (alterations adopted)).

### a. Purpose and Character of the Work

The first statutory fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). This first factor, which has been described as "[t]he heart of the fair use inquiry," *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2011), seeks to determine "whether and to what extent the work is transformative," *Campbell*, 510 U.S. at 579 (internal quotation marks omitted). Whether a work is transformative depends on the extent to which it "merely 'supersedes the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Id.* at 579 (quoting *Folsom v. Marsh*, 9 F.Cas. 342, 348 (C.C.D. Mass. 1841) (Story, J.) (citations omitted) (alterations adopted)); *see also* Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990). With regard to photographs, "[u]sing a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016) (citation omitted).

While news reporting is specifically named in 17 U.S.C. § 107 as a potential method of fair use, "a news reporting purpose by no means guarantees" such a finding. *Swatch*, 756 F.3d at 85 (citing *Harper & Row*, 471 U.S. at 557). The Second Circuit has recognized that "[i]n the context of news reporting and analogous activities, . . . the need to convey information to the public accurately may in some instances make it desirable and consonant

with copyright law for a defendant to faithfully reproduce an original work without alteration." *Id.* at 84. At the same time, "[t]he promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use 'news report.'" *Harper & Row*, 471 U.S. at 557; *see also Swatch*, 756 F.3d at 85 ("A news organization thus may not freely copy creative expression solely because the expression itself is newsworthy.").

Applying those standards here, the first factor cuts strongly against Cox. Cox's use of the Photograph was not transformative, and the court disagrees with Cox that it "add[ed] context" to the Photograph (Def. Mem. at 19) such that its use of the Photograph was fair.

To the extent that Cox argues that its use of the Photograph was fair because "news reporting is a favored use" (Def. Mem. at 16), the court is not persuaded. Cox is correct that 17 U.S.C. § 107 specifically lists news reporting as a potential method for fair use. Yet Cox forgets that "[d]isplay of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about* that work." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (citing 17 U.S.C. § 107); *see also Otto*, 345 F. Supp. 3d at 428 ("[T]he use of an image solely to illustrate the content of that image, in a commercial capacity, has yet to be found as fair use.").

Here, Cox's Article accompanying the Photograph did not "serv[e] to illustrate criticism, commentary, or a news story" *about* the Photograph. *Barcroft*, 297 F. Supp. 3d at 352. To the contrary, Cox used the Photograph as a "illustrative aid because [it] depicted the subjects described in [the] [A]rticl[e]," namely the arrest of Saipov. *Id.* "Nothing in [Cox's] [A]rticle imbues the [Photograph] with new meaning, or places it in a [new] context." *Gossip Cop*, 196 F. Supp. 3d at 406. Indeed, all Cox's Article says that could conceivably be about the Photograph is that "[Saipov]

was taken into custody"—the vast majority of the Article, by contrast, concerns Saipov's alleged terrorist acts leading up to his arrest. (*See* Pl. 56.1 ¶ 19.) To nonetheless find that Cox's use of the Photograph was fair would "eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story about the subject of that photograph. That is plainly not the law." *Barcroft*, 297 F. Supp. 3d at 352.

Cox relies heavily on *Swatch* to argue to the contrary, but that case is distinguishable. In *Swatch*, Bloomberg News published a recording of Swatch's earnings call, which Swatch had registered with the Copyright Office. 756 F.3d at 79. The Second Circuit held that the first fair use factor favored Bloomberg, noting that "whether one describes Bloomberg's activities as 'news reporting,' 'data delivery,' or any other turn of phrase, there can be no doubt that Bloomberg's purpose in obtaining and disseminating the recording at issue was to make important financial information . . . available to investors and analysts." *Id.* at 82. Yet, while publishing Swatch's financial information served "the important public purpose of disseminating important financial information," *id.* at 92, Cox's publication of the Photograph serves no such purpose and conveys no such information. To the contrary, Cox's Article solely uses the Photograph "for illustrative purposes without adding new information, new aesthetics, new insights and new understandings." *Otto*, 345 F. Supp. 3d at 428 (citation and internal quotation marks omitted). Indeed, as explained above, it is illustrating just one sentence from the Article—that "[Saipov] was taken into custody." (Pl. 56.1 ¶ 19.) The court agrees with Judge Woods' explanation of the danger of adopting Cox's argument in such a situation:

> It would be antithetical to the purposes of copyright protection to allow media companies to steal personal images and benefit from the fair use defense by simply inserting the photo in an article

which only recites factual information—much of
which can be gleaned from the photograph itself.
If so, amateur photographers would be discour-
aged from creating works and there would be no
incentive for publishers to create their own con-
tent to illustrate articles: why pay to create or
license photographs if all personal images posted
on social media are free grist for use by media
companies, as [Cox] argues here? Indeed, it seems
that this interpretation of the law would hinder the
"Progress of Science and useful Arts," and the cre-
ation of "informative, intellectually enriching
works for public consumption."

*Otto*, 345 F. Supp. 3d at 428 (citations omitted).

Therefore, because Cox's use of the Photograph was not trans-
formative, the first factor[2] weighs against a finding of fair use.

### b.  *Nature of the Copyrighted Work*

The second factor, which looks to the nature of the copyrighted
work, weighs in favor of Cox and a finding of fair use. The second
factor acknowledges that "some works are closer to the core of
intended copyright protection than others, with the consequence
that fair use is more difficult to establish when the former works
are copied." *Campbell*, 510 U.S. at 586. In reviewing this factor,
courts will determine whether a work is creative versus factual,

---

[2] Under the first fair use factor, courts also consider the commercial nature
of the secondary use of the copyrighted material. However, courts "do not
place much significance" on the commercial nature of the secondary use if
the use is not transformative. *Cariou*, 714 F.3d at 708. Here, there is no
doubt that Cox is a commercial enterprise (*see, e.g.*, Pl. 56.1 ¶ 20; Def.
Mem. at 19), but, because Cox's use was not transformative, its commercial
nature is of much less importance to the analysis under the first fair use
factor.

14

and unpublished versus published, with the scope of fair use applying more narrowly to creative and unpublished works. *Harper & Row*, 471 U.S. at 563-64. "The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy." *Id.*; *see also Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 ("The second factor considers whether the copyrighted work is of the creative or instructive type that the copyright laws value and seek to foster." (citation and internal quotation marks omitted)). In addition, publicly released works qualify for less protection from use by others than unpublished materials. *See Harper & Row*, 471 U.S. at 564. "This is because a plaintiff's right to control the first public appearance of the photo is not implicated in such scenarios, nor does there exist any race to publish, which lends itself to a finding of fair use." *Otto*, 345 F. Supp. 3d at 430 (citations and internal quotation marks omitted) (alterations adopted).

Here, Cruz acknowledges that the Photograph is "factual in nature" and was "published prior to Cox's use" of it. (Pl.'s Mem. at 16.) The court agrees and finds that the second fair use factor favors Cox. The court also notes, however, that the second factor is "rarely found to be determinative" in the fair use analysis. *On Davis*, 246 F.3d at 175.

### c.   *Amount and Substantiality of the Portion Used*

The third fair use factor considers whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole . . . are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586 (citation and internal quotation marks omitted). Generally speaking, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2d Cir. 1998).

Here, Cox does not dispute it copied the Photograph in its entirety (Def. Mem. at 21) meaning that, at the very least, this

factor does not favor fair use. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) ("Neither our court nor any of our sister circuits has ever ruled that copying of an entire work *favors* fair use."). Cox argues, however, that there was an "editorial need" to use the Photograph in its entirety so as to accurately convey the "important factual information" in the Photograph such that the factor should not weigh *against* fair use either. (*See* Def. Mem. at 21-22.)

It is true that using a protected work in its entirety may constitute fair use when the purpose of the use requires it. *See Bill Graham Archives*, 448 F.3d at 613; *see also* Leval, 103 Harv. L. Rev. at 1123 ("[A]n important inquiry [under the third fair use factor] is whether the selection and quantity of the material taken are reasonable in relation to the purported justification."). Yet, as explained above, Cox's use of the Photograph was not transformative—Cox simply thought (apparently like its competitors CNN and NBC) that the Photograph had certain qualities that would make it a good complement to the Article. *See Harper & Row*, 471 U.S. at 565 ("[T]he fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material."). In other words, Cox "made no effort to circumscribe its use such that it reproduced only enough of [the Photograph] to satisfy any reporting needs." *Gossip Cop*, 196 F. Supp. 3d at 409. Accordingly, the third factor weighs against fair use.

### d.   *Effect of the Use on the Potential Market*

The final fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor requires the court to investigate whether infringement will affect "traditional, reasonable, or likely to be developed market." *Bill Graham Archives*, 448 F.3d at 614 (citation omitted). This factor is therefore "concerned with secondary uses that, by offering a substitute for the original, usurp a market

that properly belongs to the copyright-holder." *Infinity Broad. Corp.*, 150 F.3d at 110; *see also Harper & Row*, 471 U.S. at 566-67 ("Fair use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." (citation and internal quotation marks omitted)). Finally, there is a "close linkage between the first and fourth factors, in that the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." *Authors Guild*, 804 F.3d at 223 (citing *Campbell*, 510 U.S. at 591).

This factor weighs against a finding of fair use. The record makes clear that Cruz demonstrated an interest in entering into the market for the Photograph when he entered into licensing agreements with both CNN and NBC. (*See* Pl. 56.1 ¶¶ 11-13.) As the owner of the Photograph, Cruz had the right to sell the Photograph to media outlets if he so desired; Cox's publication of the Photograph without Cruz's permission, therefore, "usurp[ed]" his market. *Infinity Broad. Corp.*, 150 F.3d at 110. Cox's reliance on *Swatch* is again inapposite. In *Swatch*, the court agreed with the district court's observation that "nothing in the record suggest[ed] any possible market effect stemming from Bloomberg's use" of the earnings call recording, and further noted that "Swatch had no interest in the exploitation of the copyright-protected aspects of the call." *Swatch*, 756 F.3d at 91. Here, by contrast, both those factors—market effect and interest in exploitation on the part of the copyright holder—are present.

Cox urges that the "public interest in receiving accurate information regarding [Saipov's] arrest . . . outweigh[ed] the personal gain to Plaintiff of licensing a photo he did not even know was newsworthy until news organizations told him so." (Def. Mem. at 22). First, the fact that a media company would appreciate the

importance or newsworthiness of a work before the work's author is neither relevant to the analysis nor particularly uncommon. *See Otto*, 345 F. Supp. 3d at 419 (explaining that plaintiff did not seek compensation for work until media outlet published work without plaintiff's permission). Second, while Cox is right that there is a direct relationship between the first fair use factor—the purpose and character of the work—and this factor, that nexus dooms Cox's argument in this case; here, Cox has not demonstrated that its use of the Photograph was transformative or necessary to convey vital factual information (as opposed to serving as an illustrative aid). If Cox could simply "use such images for free, there would be little or no reason to pay for works." *Barcroft*, 297 F. Supp. 3d at 355. Accordingly, the fourth factor weights against a finding of fair use.

###### e.   *The Factors Considered Together*

Considering all four factors together, the court finds that Cox's use of the Photograph was not fair. The non-transformative purpose and manner of Cox's use, the fact that Cox used the Photograph in its entirety, and the harm to Cruz's potential market for the Photograph outweigh any factual information conveyed by Cox's use. Accordingly, no reasonable trier of fact could find in favor of Cox on the issue of fair use and Cruz's motion for summary judgment on Cox's fair use defense is granted.

#### C.   Other Defenses to Liability

Cruz has also moved for summary judgment on Cox's remaining affirmative defenses: (1) failure to state a claim and (2) First Amendment protection.[3] Cox did not respond to Cruz's arguments on either of these defenses. The court finds that Cruz has

---

[3] By joint stipulation, Cox agreed to dismiss the following affirmative defenses: personal jurisdiction, license, safe harbor under the Digital

met his burden of demonstrating that no material issue of fact exists on either of these defenses and grants Cruz's motion as to both.

As to the First Amendment defense, the Second Circuit has held that "the fair use doctrine encompasses all claims of first amendment in the copyright field." *New Era Pubs. Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 584 (2d Cir. 1989); *see also Nihon Keizai Shimbun v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74 (2d Cir. 1999) ("First Amendment concerns are protected by and coextensive with the fair use doctrine."). Therefore, because the court has granted Cruz's summary judgment motion on Cox's fair use defense, the court also grants judgment in favor of Cruz on Cox's First Amendment defense.

As to Cox's defense that Cruz fails to state a claim, that is clearly not the case here. A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Here, Cruz has provided sufficient information in his complaint such that the court can draw the "reasonable inference" that Cox is liable for copyright infringement. Therefore, the court grants judgment in favor of Cruz as to Cox's defense of failure to state a claim.

## IV. CONCLUSION

For the foregoing reasons, Cruz's motion for partial summary judgment (Dkt. 28) is GRANTED as to Cox's liability for copyright

---

Millennium Copyright Act (17 U.S.C. § 512), acquiescence, equitable estoppel, and waiver. (*See* Jan. 15, 2019 Joint Stip. & Order re: Dismissal of Certain Affirmative Defenses.)

infringement and Cox's assertion of its affirmative defenses, including fair use. Cox's cross motion for partial summary judgment (Dkt. 34) is DENIED as to the issue of copyright infringement and fair use.

The parties are DIRECTED to contact Magistrate Judge Tomlinson regarding next steps in this case.

SO ORDERED.


Dated:     Brooklyn, New York
           March 13, 2020

                                    s/Nicholas G. Garaufis

                                    NICHOLAS G. GARAUFIS
                                    United States District Judge

# EXHIBIT A



AC0007